IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 6, 2026

### STATE OF TENNESSEE v. JOHN CHAMPION

**Appeal from the Criminal Court for Shelby County**
No. 20-01171      Jennifer Johnson Mitchell, Judge
_____

### No. W2025-00595-CCA-R3-CD
_____

A Shelby County jury convicted the defendant, John Champion, of one count of sexual battery by an authority figure. On appeal, the defendant argues that: (1) the trial court erred in denying the defendant the use of two peremptory challenges; (2) the trial court's failure to dismiss the indictment due to the State's failure to preserve evidence resulted in a fundamentally unfair trial; (3) the trial court erred in failing to declare a mistrial following a prejudicial misstatement by a witness; (4) the trial court failed to require the State to elect which incident it was relying on to establish the offense; and (5) the trial court improperly sentenced the defendant to confinement. Following a thorough review of the record, the briefs, and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN W. CAMPBELL, SR., and TOM GREENHOLTZ, JJ., joined.

Mark Mesler, Memphis, Tennessee, (on appeal) and André Wharton, Memphis, Tennessee (at trial) for the appellant, John Champion.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Steve Mulroy, District Attorney General; and Venecia Patterson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Facts and Procedural History*

This case arises from a September 2019 incident, during which the defendant touched the victim, a thirteen-year-old girl, on her vagina while she was entrusted to his care at a sleepover at his residence.

On July 10, 2020, a Shelby County grand jury indicted the defendant for one count of sexual battery by an authority figure.[1]  Prior to trial, the defendant filed several pretrial motions, including a motion to dismiss the indictment based upon the State's alleged failure to preserve evidence.

## I.        *Ferguson* Motion[2]

On July 13, 2023, the defendant filed a motion to dismiss the indictment alleging that the victim, R.B.,[3] "may have deleted or altered one (1) or more text messages" concerning the incident and that the State had a duty to preserve those text messages.[4]  The defendant asked the trial court to dismiss the indictment, citing the "significant role" the lost evidence would play in his defense.

The trial court held hearings on the defendant's motion on August 23-24 and September 5, 2023.[5]  At those hearings, the following facts were established:[6]

---

[1] The defendant was also indicted with two counts of aggravated sexual battery related to a second alleged victim.  Prior to trial, the defendant filed a motion to sever those charges, which the trial court granted.

[2] *State v. Ferguson*, 2 S.W.3d 912, 915 (Tenn. 1999).

[3] It is the policy of this Court to protect the anonymity of victims of sex crimes by identifying them by their initials only.  Additionally, this Court to refers to all minors by their initials. No disrespect is intended.

[4] At the onset, this Court notes that the defendant's initial motion to dismiss the indictment alleged the State failed to preserve evidence related to two text message threads.  The first thread was a purported text between the defendant and R.B., and the second thread was between R.B. and a friend.  While the defendant argued that the State failed to preserve both communications in the trial court, the defendant limited his issue on appeal to the "alleged text message exchange between [R.B.] and a friend on the night of the charged offense. . . ."  Accordingly, our review is limited to the messages between R.B. and E.F.  *See* Tenn. R. App. P. 13(b).

[5] Additionally, a fourth hearing was held on November 7, 2023.  During this fourth hearing, it was established that the State discovered a forensic extraction of R.B.'s cell phone had been performed.  The record reflects the extraction was performed approximately two years after the incident.  Once that extraction was discovered, it was produced to the defendant. Neither the contents nor the production of the extraction are at issue in the instant appeal.

[6] We limit our recitation of the facts to those relevant to the defendant's issues on appeal.

In September 2019, during her initial investigation of the incident, Sergeant Katie McKinnie, the lead investigator with the Shelby County Sheriff's Office (SCSO), was made aware of a text message thread between R.B. and a friend, E.F., that occurred on the night of the incident. When Sgt. McKinnie attempted to retrieve those text messages from R.B., R.B. informed her the messages had been deleted from her cell phone. Sgt. McKinnie contacted E.F. and arranged for E.F. to produce her cell phone for inspection. When E.F. met with Sgt. McKinnie, E.F. navigated to the relevant text message thread and indicated where the messages began and ended. Using her cell phone, Sgt. McKinnie took pictures of the text messages between R.B. and E.F. During this inspection, E.F. maintained possession and control of her cell phone.

Sgt. McKinnie testified that she did not take custody of either R.B.'s or E.F.'s cell phones during her investigation. Additionally, she stated that she did not have a forensic extraction performed on either phone. When her investigation concluded, Sgt. McKinnie turned over the pictures of the text messages to the district attorney's office.

On cross-examination, Sgt. McKinnie acknowledged she was aware of the capability to do a forensic extraction of cell phones but did not request it in this instance. She testified that SCSO "only had one or two people doing extractions at that time." Sgt. McKinnie also testified that as part of her investigation, she showed the screenshots to other members of Shelby County CPIT,[7] but they did not advise her to obtain possession of the cell phone or perform an extraction. She explained, "I didn't decide not to. It was not told to me that it needed to be done." Additionally, Sgt. McKinnie testified that she specifically did not request R.B.'s cell phone because she took R.B. at her word that the text messages had been deleted.

Glen Buckley, a private investigator, testified on behalf of the defendant as an expert in the field of forensic examination and analysis of cell phones. He stated that because digital evidence is "volatile by nature," it is best practice to preserve it. In this situation, Mr. Buckley testified he would have sought consent from R.B. and E.F. for an extraction of their cell phones. Moreover, Mr. Buckley opined that extraction was the best option because the pictures of the text message thread taken by Sgt. McKinnie were "worthless" because they did not include the metadata that would have indicated the date and time the text messages were sent. Further, there was no way to know what was communicated before the first picture or after the last.

---

[7] Child Protective Investigation Team

After taking the matter under advisement, the trial court denied the defendant's motion to dismiss.  In doing so, the trial court held that while it agreed with the defendant that "the cellphone had exculpatory value at the time the victim gave her statement," the defendant could have obtained comparable evidence from cell phone providers.  Ultimately, the trial court found the State did not have a duty to preserve R.B.'s cell phone.[8]

On September 3, 2024, the State proceeded to trial.

## II.     Voir Dire

During voir dire, the defendant's use of his peremptory challenges prompted a series of reverse *Batson*[9] challenges by the State.

### a.  Juror King

After the defendant used a peremptory challenge to exclude Juror King, a Caucasian juror, the State raised a reverse *Batson* challenge.  The State noted that Juror King was the fifth consecutive Caucasian juror to be struck by the defendant and argued the defendant's pattern of peremptory challenges was racially motivated.  The defendant replied,

> Judge, I'll say earlier without talking to my investigator, apparently he noticed a very overt response to the questions about alcohol earlier by the individual that [the State] is referring to.  In addition, looking down at the family members, I believe his wife worked in Shelby County Schools.

In response, the trial court stated, "I worked in Shelby County School. . . .  What's that got to do with anything that we're doing here today?"  The State remarked that it did not notice the juror's response to the questions about alcohol.  Ultimately, the trial court found "there's been a race-neutral explanation, but I'm watching very closely moving forward."

### b.  Juror Hughes

In the next round of challenges, the defendant used a peremptory challenge to strike another Caucasian juror.  The State renewed its reverse *Batson* challenge, arguing the defendant had excused another Caucasian juror "who has said he can be fair."  The defendant responded that Juror Hughes had stated during voir dire that "you've got to try to convict the guilty."  The trial court responded,

---

[8] The trial court's Order did not explicitly rule on whether the State had a duty to preserve E.F.'s cell phone.

[9] *Batson v. Kentucky*, 476 U.S. 79 (1986).

- 4 -

That's taken – taken completely out of context, because I heard it when he said it . . . . But when – when he was trying to explain to you what he was saying, I decided not to interrupt you, because I wanted him to explain it and he did a pretty good job of . . . explaining it, because he then went in -- went in and in turn told you that its their job to convict the guilty but to acquit the innocent. He told you both of those, and that's how he said it . . . .

Defense counsel argued, "I'm going on his initial instinct, his words. It has nothing to do with the man's race." The trial court found the defendant's "explanation was not enough," and Juror Hughes remained on the jury.

### c. Juror Lively

During the final round of peremptory challenges, the defendant used a peremptory challenge to exclude Juror Lively, a Caucasian juror. Again, the State renewed its reverse *Batson* challenge, asserting the defendant was continuing his pattern of using preemptory challenges to exclude white jurors.

The defense counsel asserted his race-neutral reason for the exclusion was Juror Lively's previous employment with the Shelby County Sheriff's Office as a jailer and his current employment by the State of Tennessee. The State responded that the Juror's previous employment with the Shelby County Sheriff's Office was 18 years prior to trial and that he was not familiar with any of the witnesses or parties to the current case. The State further noted that Juror Lively's employment position with the State of Tennessee was in a field unrelated to the judicial system. During further discussion, defense counsel stated,

Judge, it's not my fault that this is how he came in the beckon (*sic*) order. The other ones you made a finding as to that with this gentleman, but it just so happened that this is when he came. I can't -- I didn't create his background, his employment background, but I have to acknowledge it. You cannot tie my hands right now. Oh, this man happens to be of a certain race so I cannot strike him, even if he says, man, I used to work for law enforcement, and, you know, I – I tend to think they do a good job, whatever the case.

The State responded,

And it would be different if he had said that, but he didn't. He said, I depend on evidence, and he said that he can be fair and follow the law. And so it'd be different if he had actually said that, but he didn't. You can't put words in his mouth.

Ultimately, the trial court stated,

Let's stop. Yeah, let's stop. I'm going to find that the State has established a prima [facie] showing for [the] purpose of discrimination, and I'm going to strike this peremptory challenge.

The trial court seated Juror Lively despite the defendant's objection, concluding voir dire.

## III.  Trial

### a. *The State's Case-In-Chief*

The victim, R.B., testified that on September 14, 2019, she was thirteen years old. That night, R.B.'s mother dropped her off at the defendant's home for a sleepover with the defendant's stepdaughter, T.M. R.B.'s mother assumed that both the defendant and T.M.'s mother would be home that evening. Prior to that night, R.B. had spent the night at the defendant's residence several times, and her mother trusted that R.B. would be safe at the defendant's home while she was there.

After initially going to a nearby skating rink that evening, the girls returned to the defendant's residence. When they arrived, T.M.'s mother was at work. R.B. testified that the defendant gave them liquor and "medication." After drinking the alcohol and "hanging out," the defendant drove R.B. and T.M. around the neighborhood to "egg cars." After they returned to the residence, T.M. was not feeling well and went to the bedroom to sleep. R.B. requested the defendant to take her to "egg cars" alone, to which he agreed.

Upon their return, R.B. went into the living room to charge her cell phone. She sat in a recliner where the defendant approached and sat next to her. Then, the defendant put his hand on her thigh. He slid his hand up her thigh and inside her underwear, touching the outside of her vagina. R.B. testified that when the defendant put his hand on her thigh, she froze. After a few minutes, she got up, went into T.M.'s bedroom, and texted her friend, E.F., the following:

R.B.:  I don't know what to do [E.F]

E.F.:  What happened

R.B.:  I'm scared to tell anyone

E.F.:  U can tell me baby
       I ain't gonna tell nobody


R.B.:  I just wanna go home rn [right now]

E.F.:  Baby what happened

R.B.:  If I tell u imma cry bc I don't know why I didn't stop him
       And I don't wanna call my mom, I don't wanna tell her at all

E.F.:  Do u want me to call u

R.B.:  Nooooooooooo, he's awake

E.F.:  What is going on

R.B.:  Ur gonna get mad at me.

E.F.:  Please tell me

R.B.:  I don't wanna lose u, or u be mad at me

E.F.:  Baby I won't be

R.B.:  Promise

       I don't even know how to say it
       But I'm not drunk
       I still can make decisions and I'll still remember in the morning

E.F.:  Please tell me what happened

R.B.:  Baby

E.F.:  No don't do that [right now] tell me what happened

R.B.:  He put his hand on my thigh and then up my shorts

E.F.: I'm going to sleep

R.B.: K

E.F.: U let him
How far did he go up your shorts

R.B.: Up my shorts

E.F.: All the way

R.B.: Yeah
That's why idk [I don't know] how to tell anyone

E.F.: Does he ever pick [T.M.] up from school

R.B.: Yeah y

E.F.: Ok

R.B.: What do I even say
My eyes keep going blurry
And he gave me and [T.M.] medicine earlier and now, I'm really tired

E.F.: No u are not going to sleep
Please stay up

R.B.: I'm trying but my eyes keep going blurry

E.F.: Text your mom please

R.B.: And tell her what

E.F.: Tell her u wanna come home and if she asks y say u are not ready to talk about it

R.B.: It's my mom she's not gonna come out here unless I say why

E.F.: Baby

R.B.: Yes

E.F.: Please don't worry about this tonight u got too much emotions and stuff u don't need to worry about it rn

R.B.: Oh and I didn't tell u that he kissed me and then grabbed my butt
That's just one of the times tonight.

E.F.: Y u tell me that
Cause now I'm wayyyyyy more pissed off than I was earlier

While R.B. was in T.M.'s bedroom, the defendant texted her and told her to come back to the living room. R.B. testified that when she complied, the defendant kissed her.

Soon after, R.B. texted her godmother to see if her godfather could pick her up. R.B. testified that she wanted to talk to him because she "felt uncomfortable" and "wanted to get away from the situation." R.B.'s godfather picked R.B. up from the defendant's residence and drove her to his home.

R.B.'s godmother testified that when they arrived, R.B. was visibly upset. After allowing R.B. to "lay down" for some time, R.B.'s godmother initiated a conversation concerning what had occurred. After her initial hesitation, R.B. told her godmother that the defendant had "kissed her and that his hand went up her shorts." R.B.'s godfather immediately notified R.B.'s mother that he had picked R.B. up and that she needed to come to his house.

When R.B.'s mother arrived, R.B. was "devastated" and crying. R.B. told her mother that the defendant had put his hand up in her shorts and under her underwear. R.B.'s mother then called R.B.'s father, who notified the police.

Shortly thereafter, the family met with Deputy Justin Lambert with the SCSO. After Dep. Lambert took the family's initial statements, he drove R.B. to the Rape Crisis Center in order to have a rape test kit performed.

At the Rape Crisis Center, R.B. was interviewed by Sgt. Katie McKinnie. Sgt. McKinnie testified that R.B. reported the defendant had placed his hand inside her underwear and had made contact with her vagina. Sgt. McKinnie testified that during her investigation, she also spoke with R.B.'s friend, E.F., who confirmed she was texting with R.B. on the night of the incident. In describing her investigation into the text message thread, Sgt. McKinnie gave testimony consistent with that given during the *Ferguson* hearing.

Sgt. McKinnie also testified that the act of grooming is when a potential victim is given gifts, such as alcohol, in order to make the victim more comfortable with a perpetrator. In this situation, Sgt. McKinnie remarked that the defendant giving R.B. alcohol and taking her to egg cars were both signs of grooming.

During cross-examination, Sgt. McKinnie asked if R.B. had consumed alcohol on any occasion prior to the night in question. In response, Sgt. McKinnie stated, "there were a lot of victims so at some point there was (*sic*) questions, but I never went back and re-interviewed [R.B.]." The defendant asked for a bench conference, during which he alleged the witness was unresponsive to the question and raised concerns as to her use of the term "victims." The trial court stated, "I think she misspoke. I think she meant witnesses. You can clarify that with her." Defense counsel replied, "I don't know if I want to ring that bell." During further discussion, defense counsel stated, "it may be spontaneous, but it's problematic. But I just don't want to draw too much attention to it right now, but I wanted to address and not forget. I think we got a potential issue there with that coming out."

At the end of Sgt. McKinnie's testimony, defense counsel made a motion for a mistrial, arguing her testimony concerning "other victims" would cause the jury to infer the defendant was a "serial child molester, serial rapist or serial sexual batterer as an authority figure." The trial court offered to give the jury a curative instruction. After listening to a replay of the testimony, the trial court determined that the witness's testimony was responsive to defense counsel's question. However, defense counsel objected, claiming her use of the word "victims" was "highly prejudicial." The State countered that this witness's testimony was in response to the defense's questioning and that any potential prejudice was curable by the witness since it was an "inadvertent misstatement."

After taking the matter under advisement, the trial court found that the witness was responsive to defense counsel's questioning and that the testimony was not solicited by the State. Again, the trial court offered to issue a curative instruction as to the misstatement with input from both parties as to that instruction's language. Lastly, the trial court considered the State's proof and determined that "the proof thus far can support alternative conclusions by the jury of the defendant's absolute guilt as to what was charged." The trial court noted the misstatement by Sgt. McKinnie was made in the last ten minutes of nearly two hours of testimony, and the court did not "feel like there was emphasis placed on that statement." Ultimately, the trial court denied the defendant's motion for a mistrial.

Dr. Kimberly Bradd-Sims, a sexual assault nurse examiner (SANE) with the Rape Crisis Center, was accepted by the trial court as an expert in sexual assault examinations. Dr. Bradd-Sims testified that she performed a forensic medical examination on the victim on September 15, 2019. During her examination, R.B. reported that the defendant "began to lay his hand on my left thigh, and I froze up and didn't say anything. He has never done

that before, then he started moving his hand up into my shorts then inside my panties.  He didn't put his fingers inside me, but he touched me down there."  Dr. Bradd-Sims testified that R.B. pointed to her vagina.  R.B. told Dr. Bradd-Simms the defendant moved his hand after a few minutes.  Dr. Bradd-Sims described R.B.'s demeanor at the time of the examination as cooperative and quiet, but tense.  At the conclusion of the examination, R.B. was not found to have any injuries.  However, Dr. Bradd-Sims testified that she would not expect to see injuries in a case of "touching."  She opined that the absence of an injury does not mean a sexual assault did not occur.

During cross-examination, Dr. Bradd-Sims agreed that during R.B.'s recount of the incident, she reported the defendant "tried to kiss" her and made no mention of the defendant touching her buttocks.

At the conclusion of Dr. Bradd-Sims' testimony, the State rested.

*b. Defendant's Proof At Trial*

The defendant presented the testimony of Glen Buckley.  The defendant tendered Mr. Buckley as an expert in cell phone forensics, as well as law enforcement investigation of sex crimes, which the State did not oppose.  In addition to testifying consistently with his pre-trial testimony, Mr. Buckley explained how he would have investigated the instant case.  First, he would have sought to have an extraction performed of R.B.'s, E.F.'s, and the defendant's cell phones near the time of the offense in order to corroborate the victim's assertion that the alleged text messages occurred.  Further, he stated that he understood Sgt. McKinnie was not a forensic examiner, but "in that situation she [should have] seize[d] the phone or take[n] control of the phone" and requested that it be examined.  Second, in explaining the purpose of the Shelby County CPIT in sex crime cases, Mr. Buckley stated that in his experience 90% of the decisions related to the investigative steps were made by law enforcement and not the district attorney.  As to the allegations of grooming, Mr. Buckley testified that grooming was a "process" that occurred over a length of time to "desensitize" a victim and to build trust.  In his opinion, he did not observe any evidence of that behavior in this matter.

On cross-examination, Mr. Buckley conceded he had no personal experience with decision making process regarding sex crime investigations in Shelby County.  Mr. Buckley noted, "I'm not saying what [Sgt. McKinnie] should have done. I'm say (*sic*) what I would have done. . . .  And what I believe is best practice."  Finally, he agreed that an adult giving a minor alcohol and taking them to "egg cars" could be elements of grooming, but he considered grooming to be a process.

Following closing argument and based on the proof presented at trial, the jury found the defendant guilty of one count of sexual battery by an authority figure.

### IV. Sentencing

A sentencing hearing was held on March 18, 2025. During the hearing, the defendant's presentence report and psychosexual report were entered into evidence without objection. The State also introduced the testimony of the victim's parents. R.B.'s mother testified that as a result of the defendant's actions, R.B.'s life had changed. She had become angry and lost trust in men, "even male family members and male friends of the family that she had known her whole life." According to R.B.'s mother, R.B. has developed anxiety and obsessive-compulsive disorder. R.B.'s mother asked the trial court to impose the maximum sentence. The State also entered R.B.'s impact statement.

The defendant presented the testimony of two friends who collectively attested to the defendant's good character and asked the court for mercy on his behalf. Additionally, the defendant's parents testified. The defendant's mother stated, "no one could make [her] believe that he's done these things that he's accused of." The defendant's father testified to the defendant's good grades in high school and that he raised the defendant to "always do right." The defendant's wife testified that the defendant was the sole provider for her family, described him as "selfless," and asked the trial court to "keep their family together."

Lastly, the defendant made a statement on his own behalf, maintaining his innocence and asking the court for mercy in order to stay with his three small children. He stated he had to spend his "entire savings to hire a lawyer," resulting in his house being foreclosed. Additionally, he was forced to step down from his position of employment due to stress. The defendant asked the trial court to place him on probation so he could move forward and provide for his family. The defendant also entered into the record exhibits attesting to his academic achievements in school and letters professing his moral character.

At the conclusion of proof, the trial court heard argument from the State and the defendant. The State contended the trial court should order confinement based upon the sentencing principles under Tennessee Code Annotated section 40-35-210. The State noted that the defendant premeditatedly purchased and provided alcohol to a thirteen-year-old girl and took her out to commit a crime, grooming the victim for abuse. Additionally, the State noted the defendant's dishonest answer in the psychosexual evaluation, concerning whether he had been otherwise accused of sexual contact with children. The report indicated that the defendant denied being accused of having sexual contact with children apart from the instant charges, and yet, the record reflected the defendant had two pending indictments for aggravated sexual battery against another victim. The State also highlighted the defendant's lack of empathy for R.B., describing her as "manipulative."

- 12 -

The defendant asked the trial court to give the psychosexual report limited consideration. He argued the report used the defendant's denial of the accusations as a "responsivity factor" that would negatively impact his compliance with probation. Additionally, he argued the psychosexual report's notation of a lack of empathy for R.B. was only an interpretation of his answers during the interview and not a direct quote. Lastly, the defendant argued probation was appropriate because he would be further punished through losing employment opportunities and being on the sex offender registry.

Following testimony and argument from counsel, the trial court stated it had considered the evidence presented at trial and during the hearing, including the presentence report, the principles of sentencing and arguments made as to the sentencing alternatives, the nature and characteristics of the criminal conduct involved, the evidence and information offered by the parties on the mitigating and enhancement factors, any statistical information provided by the Administrative Office of the Courts, and any statement the defendant made on his own behalf, the results of the validated risk and needs assessment, and the defendant's potential for rehabilitation or treatment. *See* Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). The trial court also applied enhancement factor (23), the defendant is an adult and sells or gives or exchanges a controlled substance or other illegal drug with a minor, and mitigating factor (1), the defendant's criminal conduct neither caused nor threatened serious bodily injury applicable to the defendant. *See* Tenn. Code Ann. §§ 40-35-114, -113

In considering alternative sentencing, the trial court stated it was "extremely concerned about this case because it sends a message to those folks in the community who think they can hide behind the fact that they offend younger people, more vulnerable people and it happens in their home." The trial court gave consideration to the fact that there was no serious bodily injury but stated that "it was just one factor." While the trial court found the defendant would likely not commit another offense while on probation, it was "leery of his potential for rehabilitation." The trial court noted that the defendant was "extremely smart" and aware he was being "watched" but highlighted that the defendant had "placed this all at the feet of R.B." Ultimately, the trial court found the defendant was a risk to the community. As a result, the trial court ordered the defendant to serve a four-year sentence in confinement as a Range I offender.

The defendant filed a motion for new trial, which was denied. A timely notice of appeal followed.

***Analysis***

- 13 -

On appeal, the defendant contends (1) the trial court improperly granted the State's reverse *Batson* challenges and denied him the use of two peremptory challenges; (2) the State failed to preserve evidence, resulting in a fundamentally unfair trial; (3) the trial court erred by failing to declare a mistrial following the prejudicial misstatement of a witness; (4) the trial court failed to require the State to elect an offense following its conclusion of proof; and (5) the trial court erred in sentencing the defendant to confinement. The State responds that (1) the trial court properly granted the *Batson* challenges because the defendant's reasons for striking were racially motivated; (2) the State did not have a duty to preserve the electronic text message data that was not within its possession or control; (3) the trial court properly denied the defendant's request for a mistrial; (4) the defendant cannot satisfy its burden to prove plain error regarding an election of offense; and (5) the trial court did not abuse its discretion by imposing a sentence of confinement. After review, we agree with the State.

## I.    Reverse *Batson* Challenge

"Under the Equal Protection Clause of the Fourteenth Amendment, neither the state prosecutor nor the defendant may exercise a peremptory challenge to remove a prospective juror solely on the basis of race." *State v. Logan*, No. W2008-00736-CCA-R3-CD, 2009 WL 782757, at *2 (Tenn. Crim. App. Mar. 25, 2009) (citing *Batson v. Kentucky*, 476 U.S. 79 (1986)). "Although a defendant has no right to a petit jury composed in whole or in part of persons of [the defendant's] own race, he or she does have the right to be tried by a jury whose members are selected by nondiscriminatory criteria." *Powers v. Ohio*, 499 U.S. 400, 404 (1991) (internal quotation omitted). Conversely, a prosecutor may lodge, on the basis of race, a "reverse *Batson*" objection to a defendant's peremptory challenge of jurors. *State v. Spratt*, 31 S.W.3d 587, 596 (Tenn. Crim. App. 2000) (quoting *State v. Hathaway*, No. 02C01-9702-CR-00082, 1997 WL 793505, at *6 (Tenn. Crim. App. Dec. 30, 1997)).

The *Batson* court provided a three-step process for evaluating whether a juror has been impermissibly excluded on the basis of race. First, the [opponent] must "make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. 79, 93-94 (citation omitted). "Once the [opponent] makes the requisite showing, the burden shifts to the [proponent] to explain adequately the racial exclusion." *Id.* at 94 (citation omitted). "The race-neutral explanation need not be persuasive or even plausible." *Logan*, 2009 WL 782757, at *2 (citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995)). "Unless purposeful discrimination is inherent in the explanation, the reason offered will be deemed race-neutral." *State v. Hugueley*, 185 S.W.3d 356, 368 (Tenn. 2006) (citing *Purkett*, 514 U.S. at 768). Then "if the [proponent] offers a race-neutral explanation, the trial court must 'determine, from all of the circumstances, whether the [opponent] has established purposeful discrimination.'" *State v. Echols*, 382 S.W.3d 266, 281-82 (Tenn. 2012)

(quoting *State v. Kiser*, 284 S.W.3d 227, 255-56 (Tenn. 2009)). "The trial court may not simply accept a proffered race-neutral reason at face value but must examine the [proponent's] challenges in context to ensure that the reason is not merely pretextual." *Hugueley*, 185 S.W.3d at 368. "If the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded." *State v. Hugueley*, 185 S.W.3d 356, 369 (Tenn. 2006) (citing *Woodson v. Porter Brown Limestone Co., Inc.*, 916 S.W.2d 896, 903 (Tenn. 1996)).

"When determining the existence of a *Batson* violation, the trial court must carefully articulate specific reason for each finding on the record." *Logan*, 2009 WL 782757, at *3 (citation omitted). "'On appeal, the trial court's findings are to be accorded great deference and not set aside unless clearly erroneous.'" *Spratt*, 31 S.W.3d at 596. (quoting *Woodson*, 916 S.W.2d at 906). Our supreme court has noted, "determination of the [proponent's] discriminatory intent or lack thereof turns largely on the evaluation of the [proponent's] credibility, of which the attorney's demeanor is often the best evidence." *Kiser*, 284, S.W.3d at 255 (quoting *State v. Smith,* 893 S.W.2d 908, 914 (Tenn. 1994)). "Credibility judgments lie particularly within a trial judge's realm." *Id.* "We therefore give great deference to a trial court's findings in this regard and will not set them aside unless they are clearly erroneous." *Id.* at 256; *see also State v. Snyder*, 552 U.S. 472, 477 (recognizing that "[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.")

In the instant case, the State raised a series of reverse *Batson* objections in response to the defendant's continuing pattern of excluding jurors of the Caucasian race through his use of peremptory challenges. After the trial court denied the State's initial *Batson* objection as to Juror King, the State renewed its objection when the defendant sought to use a peremptory strike on a seventh Caucasian juror. The trial court, asking for the defendant's response, shifted the burden to the defendant. The defendant responded that Juror Hughes stated, "you've got to try and convict the guilty." The trial court found this reasoning was "taken completely out of context. . . ." In conclusion, the defendant argued that Juror Hughes was "clearly a State's juror." The trial court found that the defendant had "struck seven white jurors in row," rejecting the reason proffered by the defendant.

Upon review of the record, we find no error in the trial court's application of *Batson.* While the defendant proffered a race-neutral reason, "[t]he crucial inquiry is the facial validity of the [proponent's] explanation." *Id.* The trial court observed the defendant's pattern of peremptory strikes of the venire, the demeanor of the defense attorney and the prospective jurors. *See State v. Pitts*, No. M2022-00581-CCA-R3-CD, 2023 WL 105623, *9 (Tenn. Crim. App. Jan. 5, 2023). Ultimately, it falls upon the trial court to "assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El v. Dretke*,

545 U.S. 231, 241 (2005). Additionally, the trial court noted that the defendant's alleged race-neutral reason was taken out of context, stating,

> That's taken – taken completely out of context, because I heard it when he said it . . . . But when – when he was trying to explain to you what he was saying, I decided not to interrupt you, because I wanted him to explain it and he did a pretty good job of . . . explaining it, because he then went in -- went in and in turn told you that it's their job to convict the guilty but to acquit the innocent. He told you both of those, and that's how he said it . . . .

Accordingly, the trial court rejected the defendant's proffered reason and found the defendant was excluding prospective jurors based upon their race. Giving that finding great deference, we conclude there was no error in the trial court's application of *Batson* in denying the defendant his use of a peremptory challenge to strike Juror Hughes.

In the final round of voir dire, the defendant used a peremptory challenge to attempt to exclude Juror Lively, a Caucasian juror. The State renewed its *Batson* objection. When asked for its racially-neutral reason for excluding Juror Lively, the defendant pointed to Juror Lively's prior employment in law enforcement and current employment with the State of Tennessee. The State responded that Juror Lively's law enforcement employment ended twenty years prior to trial and that his current employment was in an irrelevant field. Ultimately, the trial court stated, "I'm going to find that the State has established a prima [facie] showing for [the] purpose of discrimination, and I'm going to strike this peremptory challenge."

Here, the trial court found that the defendant's pattern of excluding prospective jurors based upon their race was evidence of an intent to discriminate. While the defendant proffered an apparent race-neutral reason of employment history, it was the trial court's province to weigh the totality of the circumstances to determine if the reason was pretextual. In reaching its determination, the trial court weighed the defendant's systemic pattern of excluding Caucasian jurors with its proffered reason of employment history and found that the defendant's reason was pretextual. Given the deference owed to the trial court's findings, we conclude the trial court did not err in its conclusion.

We note that while the trial court did not explicitly detail its reasoning for challenging the defendant's peremptory challenge as to Juror Lively, the record is sufficient for our review given the high deference accorded to the trial court's findings. The record reflects that the trial court rejected the reason proffered by the defendant for the exclusion of Juror Lively, and the evidence supports that determination. While the defendant tendered a race-neutral reason of "history of law enforcement employment," the trial court's decision to seat Juror Lively was an implicit determination that under the totality

- 16 -

of the circumstances, the State had established purposeful discrimination on the part of the defendant. "Because the core issue is the [proponent's] discriminatory intent, or lack thereof, the trial court's finding 'largely will turn on evaluation of credibility.'" *State v. Ellison*, 841 S.W.2d 824, 827 (Tenn. 1992) (quoting *Batson*, 476 U.S. at 98, n.21). "Both this Court and the United States Supreme Court have previous recognized that "[t]here will seldom be much evidence bearing on th[e] issue [of discriminatory intent], and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Hugueley*, 185 S.W.3d at 374 (Tenn. 2006) (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991)).

## II.    *Ferguson* Motion

The defendant contends the trial court erred in not dismissing the indictment due to the State's failure to preserve evidence. Specifically, the defendant argues that the State had a duty to preserve the electronic text message data between R.B. and E.F. and that its failure to do so resulted in an unfair trial. The State insists it had no duty to preserve the electronic text message data because R.B.'s and E.F.'s cell phones were not within the State's possession and control. We agree with the State.

Every criminal defendant is afforded the right to a fair trial by both the Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution. U.S. CONST. amend 14; Tenn. Const. art. I, §8. "To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment." *State v. Ferguson*, 2 S.W.3d 912, 915 (Tenn. 1999) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). "Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt." *Id.* (citing *United States v. Agurs*, 427 U.S. 97, 110-11 (1976)).

The *Ferguson* court adopted a balancing approach to determine whether the loss or destruction of potentially exculpatory evidence renders a defendant's trial fundamentally unfair. *Ferguson*, 2 S.W.3d at 917. "The first step in this analysis is to determine whether the State had a duty to preserve the evidence." *Id.* "Generally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tenn[essee] R[ules] [of] Crim[inal] P[rocedure] 16, or other applicable law." *Id.* However,

> [w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value

- 17 -

that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable available means.

*Id.* (quoting *California v. Trombetta*, 467 U.S. 479, 488 (1984)). Therefore, "[i]f the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty, the analysis moves to a consideration of several factors which should guide the decision regarding the consequences of the breach." *Id.* The applicable factors include: "1) the degree of negligence involved; 2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and 3) the sufficiency of the other evidence used at trial to support the conviction." *Id.*

The first step of the *Ferguson* analysis requires the Court to determine whether the State had a duty to preserve the electronic text messages of R.B. and E.F. "Tennessee courts have repeatedly held that the State is not required to turn over material that was not in the possession or control of the State when it was lost." *Trezevant v. State*, No. W2024-01198-CCA-R3-PC, 2025 WL 2382823, at *24 (Tenn. Crim. App. Aug. 18, 2025); *see also State v. Hubbard*, No. W2016-01521-CCA-R3-CD, 2017 WL 2472372, at *7 (Tenn. Crim. App. June 7, 2017) (quoting *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. 1992)) ("The State is not required to preserve or disclose "information which is not possessed by or under the control of the prosecution or another governmental agency."); *State v. Somerville*, No. W2001-00902-CCA-R3-CD, 2002 WL 1482730, at *4-5 (Tenn. Crim. App. Feb. 11, 2002) (The State did not have a duty to preserve video evidence that was in the possession of a third party when it was destroyed.)

In *State v. Pittman*, a defendant challenged the State's failure to preserve a sexual assault victim's father's cell phone, which he asserted contained exculpatory text messages between the victim and her father. *Pittman*, No. W2024-00807-CCA-R3-CD, 2025 WL 2048406, at *6 (Tenn. Crim. App. July 22, 2025). Similar to the case at bar, the State argued that the investigators "never collected the cell phone," and thus, the State did not have possession or control to trigger a duty to preserve any potential evidence. *Id.* This Court acknowledged that in *Ferguson* our supreme court "did not impose a duty to collect evidence, but a duty to preserve it." *Id.* Further, the "State is not required to investigate cases in any particular way." *Id.* (quoting *State v. Brock*, 327 S.W.3d 645, 698 (Tenn. Crim. App. June 29, 2009)). In short, the State does "not have a duty to collect a phone or perform forensic analysis of a phone because it was never in the State's possession." *Id.*

Here, Sgt. McKinnie testified that she did not obtain possession or control of either cell phone belonging to R.B. or E.F. She did not request search warrants or perform extractions for either cell phone. Her reasoning and methods of investigation are irrelevant

to the analysis. *See State v. Merriman*, 410 S.W.3d 779, 794 (Tenn. 2019). Because there is no duty to preserve evidence not within the State's possession or control, the trial court correctly found the State did not have a duty to preserve the electronic text messages.

Moreover, even assuming the State had possessed the evidence, no duty to preserve that evidence would have existed because the Defendant had access to comparable evidence through other means. For the State to have had a duty to preserve, the electronic text messages must "possess an exculpatory value that was apparent before the evidence was destroyed and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *State v. Brock*, 327 S.W.3d 645, 698 (Tenn. Crim. App. 2009).

Here, the trial court found that the text messages "had exculpatory value at the time the victim gave her statement," but that this evidence was also available to the defendant through other channels: cell phone providers.[10] "The prosecution is not required to disclose information that the accused already possesses or is able to obtain." *Marshall*, 845 S.W.2d at 233. "The defendant "must bear the responsibility of [his] failure to seek its discovery" if the evidence is accessible to both the prosecutor and the defendant." *Hubbard*, 2017 WL 2472372, at *7. Here, the trial court correctly held that the defendant had the ability to obtain the electronic data, especially concerning messages between himself and the victim, through other means of discovery.

Because the State did not have a duty to preserve the text messages in electronic form, it is not necessary for us to determine the fundamental fairness of the trial in the absence of the evidence. The defendant is not entitled to relief on this issue.

## III. Mistrial

The defendant argues that the trial court erred in failing to declare a mistrial following a misstatement by a witness at trial. Specifically, the defendant argues Sgt. McKinnie's testimony that there were "a lot of victims" was highly prejudicial. The State responds that the defendant has waived this issue for failure to cite legal authority in its original brief. Notwithstanding that waiver, the State argues that the trial court's refusal to declare a mistrial was proper.

A reading of the defendant's brief on this issue reveals that the defendant has failed to make more than a mere conclusory and cursory argument and has failed to cite authority in support of the issue. This Court has recognized that "simply raising an issue is not

---

[10] While the trial court's order appears to be focused solely on the text message thread between the defendant and R.B., its reasoning also applies to the text message thread between R.B. and E.F.

sufficient to preserve it for appellate review." *State v. Cunningham,* No. M2023-00909-CCA-R3-CD, 2024 WL 3634259, at *2 (Tenn. Crim. App. Aug. 2, 2024) (citation omitted), *no perm. app. filed*. Tennessee Rule of Appellate Procedure 27(a)(7)(A) requires an appellant to present an argument supported by citations to authority and appropriate references to the record. Rule 10(b) of this Court reinforces that requirement: issues unsupported by argument, citation to authorities, or references to the record are waived. *See also State v. Molthan*, No. M2021-01108-CCA-R3-CD, 2022 WL 17245128, at *2 (Tenn. Crim. App. Nov. 28, 2022) (recognizing waiver when the defendant did not "make any argument in support of this issue in his brief" and did not "cite to any authorities or appropriate references in the record"), *no perm. app. filed*.

The defendant's brief addressing this claim consists of several paragraphs simply reciting the procedural and factual history from his trial and then has one conclusory paragraph stating that the trial court erred in not granting a mistrial and includes one single and broad reference to Tennessee Rule of Evidence 404(b). The defendant does not address how he was prejudiced by the trial court's ruling, why the alternatives offered by the trial court were not sufficient to alleviate the alleged harm caused by Sgt. McKinnie's testimony, or provide any legal authority identifying the legal standard that governs a claim of this kind, cite any relevant authority, or develop a factual argument under any recognized legal framework. In essence, to address this claim on the merits, we would first need to construct the constitutional framework on the defendant's behalf and identify the specific legal standard that applies. We would then need to marshal the relevant evidence under that standard and assess whether it compels relief. Our role as an error-correction court does not permit us to undertake those efforts. *See City of Memphis v. Edwards by & Through Edwards*, No. W2022-00087-SC-R11-CV, 2023 WL 4414598, at *2 (Tenn. July 5, 2023) (Order) ("[D]ecades of caselaw and the very foundations of our adversarial justice system dictate that courts cannot and should not shoulder the burden of fashioning the arguments of the parties who have chosen not to do so for themselves." (citation omitted)). Because the defendant has failed to present any developed argument in support of his claim, we conclude that he has waived appellate consideration of this issue. *See* Tenn. R. App. P. 27(a)(7); *State v. Hamilton*, No. W2023-01127-CCA-R3-CD, 2024 WL 4130757, at *5 (Tenn. Crim. App. Sept. 10, 2024), *perm. app. denied* (Tenn. Feb. 20, 2025). The defendant is not entitled to relief on this ground.

## IV. Election of Offense

The defendant argues the trial court committed plain error by failing to mandate that the State elect an offense at the close of its proof. Specifically, the defendant asserts that the State did not elect whether it was seeking a conviction based upon the defendant's touching of the victim's vagina or buttocks. The State responds that the defendant cannot meet the plain error standard. Moreover, the State requests this Court decline relief because

the defendant invited the alleged error. After reviewing the record, we conclude the defense conceded that only one criminal event occurred, and regardless, the State cured any potential error in its summation.

Our supreme court has consistently held that "when the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought." *State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). "The election doctrine refers to the prosecutor's duty in a case where evidence of multiple separate incidents is introduced to elect for each count charged the specific incident on which the jury should deliberate to determine the defendant's guilt." *State v. Qualls,* 482 S.W.3d 1, 9 (Tenn. 2016). However, when the evidence does not establish that multiple offenses have been committed, "the need to make an election never arises." *Adams*, 24 S.W.3d at 294.

At trial, evidence was presented that the defendant touched R.B. on her vagina and her buttocks. At the close of the State's case-in-chief, the State did not elect which touching it intended to rely upon to prove the indicted offense, and the defendant did not contemporaneously object. The defendant's first notation of the issue came at the close of their proof, whereby the trial court responded, "there was . . . nothing to elect. We got one event? All there at one time." The defendant responded, "correct." Therefore, the defendant agreed there was only one criminal occurrence, and no election was needed. Accordingly, this issue is without merit.

Moreover, any error caused by the State's failure to elect an offense at the close of its case-in-chief would be harmless beyond a reasonable doubt. *State v. Smith*, 492 S.W.3d 224, 237 (Tenn. 2016) (holding that "a reviewing court may consider a prosecutor's statements in closing argument solely as part of its constitutional harmless error analysis"). During its closing argument, the State made clear which proof it was relying upon to support the charge of sexual battery by an authority figure. When discussing the elements of the charge, the State referred solely to the evidence establishing the defendant had touched the victim on her vagina, making no mention of her buttocks. Accordingly, although the proof did not present multiple events, the State's summation would have rendered any election issue harmless beyond a reasonable doubt. *See, e.g.*, *State v. Smith*, No. M2024-00062-CCA-R3-CD, 2024 WL 4905209, at *20 (Tenn. Crim. App. Nov. 27, 2024) (finding improper election to be harmless beyond a reasonable doubt where the State's closing argument "narrowed the jury's attention to one discrete instance of touching, and the jury was generally instructed on the unanimity requirement"), *perm. app. denied* (Tenn. Apr. 17, 2025).

## V. Sentencing

Lastly, the defendant challenges the trial court's sentencing determination. Specifically, the defendant contends the trial court did not properly consider the sentencing principles or the relevant facts and circumstances when denying probation. The State maintains the trial court acted within its discretion. We agree with the State.

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to the sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). When an accused challenges the length and manner of service of a sentence, this Court reviews the trial court's determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-710.

Generally, probation is available if the sentence actually imposed is ten years or less. Tenn. Code Ann. § 40-35-303(a). A defendant who is convicted as an especially mitigated or standard offender of a Class C, D, or E felony is considered a favorable candidate for alternative sentencing. Tenn. Code Ann. § 40-35-102(6)(A). In determining whether incarceration is appropriate, the trial court should consider whether:

(A)     Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B)     Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C)     Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1)(A)-(C). Additionally, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the

defendant should be considered in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(4), (5).

A trial court's decision to grant or deny probation is reviewed under an abuse of discretion standard with a presumption of reasonableness when the sentence reflects the purposes and principles of sentencing. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). "[A] trial court's decision to grant or deny probation will not be invalidated unless the trial court wholly departed from the relevant statutory considerations in reaching its determination." *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014) (order) (per curiam). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* Tenn. Code Ann. § 40-35-303(b); *State v. Russell*, 773 S.W.2d 913, 915 (Tenn. 1989); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

During the sentencing hearing, the trial court stated that it reviewed the evidence presented at trial and at the sentencing hearing, the presentence report, the risk assessments performed, the principles of sentencing and the arguments of counsel. Further, the trial court found enhancement factor (23), the defendant is an adult and sells or gives or exchanges a controlled substance, controlled substance analogue or other illegal drug with a minor, applicable to the defendant's conviction. *See* Tenn. Code Ann. § 40-35-114. The trial court applied mitigating factor (1), the defendant's criminal conduct neither caused nor threatened serious bodily injury. *See* Tenn. Code Ann. § 40-35-113. As a result, the trial court sentenced the defendant to a term of four years.

On appeal, the defendant does not challenge the application of the enhancement and mitigating factors or the length of his four-year sentence. Rather, the only challenge raised on appeal concerns the trial court's denial of the defendant's request for probation.

Because the sentence imposed upon the defendant was ten years or less, he was an eligible for probation. Tenn. Code Ann. § 40-35-303(a). In compliance with Tennessee Code Annotated section 40-35-103(1)(B), the trial court found confinement was particularly suited to provide an effective deterrence to others likely to commit similar offenses, stating, "[t]he Court is extremely concerned about the message it's going to send if the defendant is just given straight probation." Additionally, the trial court found confinement was necessary to avoid depreciating the seriousness of the offense. The trial court held, "[t]he Court is extremely concerned about this case because it sends a message to those folks in the community who think they can hide behind the fact that they offend younger people, more vulnerable people and it happens in their home." *See* Tenn. Code Ann. § 40-35-103(1)(B).

- 23 -

Additionally, in determining whether to sentence the defendant to serve in confinement or on probation, the trial court examined whether the defendant was a suitable candidate for probation. Though the trial court recognized the defendant was unlikely to commit another crime on probation, the trial court ultimately found the facts and circumstances of the offense outweighed that possibility, primarily the defendant's lack of empathy for the minor victim and the psychosexual report's description of the defendant as dishonest and in denial. Thus, the record shows the trial court did not solely rely upon the need to avoid depreciating the seriousness of the offense in its determination to deny probation because it weighed and considered other factors relevant to the defendant's likelihood of rehabilitation.

It is clear from the record that the trial court applied the purposes and principles of sentencing and weighed the enhancement and mitigating factors before imposing a sentence of confinement. Because the trial court's sentence was within range and levied in compliance with the purposes and principles of sentencing, it is presumed reasonable. Therefore, the trial court acted within its discretion in denying alternative sentencing and imposing a sentence of full confinement, and the defendant, therefore, is not entitled to relief.

### Conclusion

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

s/ _J. ROSS DYER_
J. ROSS DYER, JUDGE